THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA )
    ex rel. HALLDORSON et al., )
                                                )
    Plaintiff, )
                                                )
            v. ) Civ. Action No.1:06CV01618
                                                ) (EGS)
THE SANDI GROUP, et al., )
                                                ) **FILED UNDER SEAL**
    Defendants. )

## AMENDED COMPLAINT

1. Defendant The Sandi Group ("Sandi") received a subcontract from Defendant DynCorp International LLC ("DynCorp") to support the U.S. Department of State's ("Government's") International Civilian Police Program ("CivPol"). Sandi grossly overcharged for this work. DynCorp knew of this overcharging, and willingly passed these false claims on to the Government for payment, in order to boost its own remuneration. The Defendants' claims for payment to the Government thus were false and fraudulent.

2. The *Qui Tam* Plaintiffs complained to the Defendant about its overbilling. They then suffered in the terms and conditions of their employment as a result of their whistle-blowing.

## PARTIES

3. *Qui Tam* Plaintiff Andrew Halldorson is domiciled at 4303 Tenthouse Ct., West River, MD 20778. *Qui Tam* Plaintiff Brian Evancho is domiciled in Florida. They joined Sandi as employees.

4. Defendant The Sandi Group is, on information and belief, a District of Columbia entity, with its principal place of business at 1733 Connecticut Avenue, N.W., Washington, D.C. 20009. It provides support for reconstruction activities under government contracts and subcontracts in Iraq and Afghanistan. It claims to be Iraq's largest private-sector employer.

5. Defendant Rubar S. Sandi ("Rubar Sandi") is, on information and belief, an Iraqi Kurd transacting business in the District of Columbia. He came to the United States in or around 1975. He graduated from Hamilton College in Virginia. He was Chairman of the U.S.-Iraq Business Council when the 2003 occupation of Iraq began. He is the Chairman of the Board and Chief Executive Officer of The Sandi Group.

6. Defendant DynCorp International LLC is a limited-liability partnership transacting business in the District of Columbia and elsewhere. It was founded in 1946, and it has over 25,000 employees working at over 500 locations worldwide. It is presently owned by a private venture-capital group.

7. On the Government requirement at issue, Sandi serves as a subcontractor to DynCorp. Sandi and DynCorp formed a joint venture for this purpose, the Sandi-Dyn Corporation. The joint venture works in the areas of construction and communication engineers, base operation supervisors, aerospace maintenance, medical staff, food service, explosive detection specialists, humanitarian support and nation building specialists, logistic services and air cargo services. Sandi claims to have formed a "strategic partnership" with DynCorp.

8. The false and fraudulent claims at issue in this case were submitted to the U.S. Department of State. Its headquarters is at 2201 C Street, N.W., Washington, D.C. 20520. It maintains a procurement office performing some of the relevant actions at the U.S. Department

of State Office of Logistics Management, Acquisition Management, SA-6, 2nd Floor, P.O. Box 9115, Rosslyn Station, Arlington, VA 22219.

## JURISDICTION AND VENUE

9. This action arises under 31 U.S.C. § 3729, *et seq.* Therefore, this is a case or controversy arising under the laws of the United States. Hence there is subject matter jurisdiction under 28 U.S.C. § 1331. The Court has supplemental jurisdiction of the claim here arising under state law, which forms part of the same case or controversy, under *id.* at 1367.

10. This action may be brought in this judicial district under 31 U.S.C. § 3732(a) because, *inter alia*, the Defendants transact business in this judicial district.

## ALLEGATIONS

### I.  CivPol

11. Within the U.S. Department of State, the U.S. Bureau for International Narcotics and Law Enforcement Affairs ("INL") is responsible for CivPol. CivPol recruits U.S. police officers to participate in international civilian police activities and development programs, as part of international peacekeeping operations.

12. Over 4,000 U.S. police officers have participated in CivPol, beginning in Haiti in 1994. Currently, more than 1,000 serve in CivPol.

13. The Government makes the decision to deploy CivPol officers on a specific mission. The operation of CivPol is largely performed by private contractors, however. These include Defendant DynCorp, as well as Civilian Police International LLC and PAE Government Services, Inc. DynCorp helps to recruit, select, equip and deploy U.S. CivPol officers. This includes CivPol officers deployed in Iraq. The Government provides funding and oversight for such missions.

14. At the beginning of the occupation of Iraq, the U.S. Army's Office of Reconstruction and Humanitarian Assistance ("ORHA") asked INL to enter Iraq and begin police reconstruction efforts, to help restore law and order. The U.S. State Department has said that:

> In the post-conflict reconstruction of Iraq, re-establishment of civilian and police authority and the restoration of law and order are critical and are among the U.S. Government's (USG) highest priorities. Without this component of USG policy, economic development and democratization cannot take place in Iraq…Failure to…support the CivPol deployment to Iraq will irrevocably harm the USG effort to restore law and order in Iraq.

There was little or no pre-occupation planning for this effort, so INL conducted an urgent procurement to respond to this request. INL initially estimated this requirement at $100 million, for 150 officers. (As alleged below, the number of CivPol officers in Iraq actually is substantially larger.)

15. INL limited competition to DynCorp and one other offeror. The Government awarded the contract to DynCorp on April 17, 2003. The determining factor was that DynCorp promised to perform the requirement at a lower cost. In 2004, DynCorp received a successor CivPol contract, for up to $1,750,000,000, including up to $800 million for CivPol work in Iraq.

16. The Government deploys CivPol officers in a variety of missions related to Iraq. Beginning in September 2003, INL constructed and then operated the International Police Training Center in Amman, Jordan, to train Iraqi police in an eight-week training program. Over 300 U.S. police trainers serve there. Approximately 500 U.S. police officers serve in Iraq, working with Iraqi police directly. Smaller numbers of U.S. police officers serve as corrections and criminal justice advisors in Iraq.

17. On behalf of the Government, DynCorp has recruited and deployed CivPol officers serving in these missions in Iraq.[1] The officers work armed, but in plain clothes. DynCorp signs a one-year contract with each one. The standard salary is over $120,000 a year. DynCorp also provides all lodging, meals and transportation, at the Government's expense.

18. Much of DynCorp's CivPol contract is operated out of DynCorp's Fort Worth office, at 4501 Highway 360 South, Ft. Worth, Texas 76155. There are related DynCorp operations at DynCorp headquarters in Reston, Virginia.

19. CivPol funding has come from U.S. appropriated funds. For instance, DynCorp received funds under its initial Iraq CivPol contract from the Emergency Supplemental Appropriations for Defense and for the Reconstruction of Iraq and Afghanistan Act, 2004 (P.L. 108-66), *inter alia*.

20. In or around mid-2003, DynCorp hired Sandi, under DynCorp's CivPol contract, to provide logistical support to CivPol officers and operations in Iraq. DynCorp has issued numerous task orders to Sandi for various forms of CivPol support. Sandi submitted invoices under these CivPol task orders. For the reasons alleged below, the invoices were inflated. DynCorp knowingly incorporated these inflated invoices in false claims that DynCorp submitted to the Government. On information and belief, this misconduct will continue until this lawsuit stops it.

II. **CivPol Overcharging**

---

[1] The DynCorp CivPol recruiting brochure for Iraq begins by asking, "Do you like adventure?" DynCorp's poster takes a different tack, stating in letters one inch high:

Civilian Police Mission in IRAQ
$120,632.00

21. *Qui Tam* Plaintiff Andrew Halldorson joined Sandi in April of 2005. He began with a salary of $107,000, and later qualified for a 50% "uplift." His employment was terminated in October of 2005. *Qui Tam* Plaintiff Brian Evancho served during a similar period. He was employed as a construction manager. Aside from allegations made on information and belief, they personally witnessed the misconduct alleged below.

22. <u>Camp Construction</u>. DynCorp issued task orders to Sandi to construct eleven camps for CivPol. These task orders authorized Sandi to charge DynCorp (and, indirectly, the Government) Sandi's actual allowable costs, plus six percent for general and administrative expenses ("G&A"), and ten percent for profit.

23. Sandi illegally marked up its actual costs by up to 100%. It then added its G&A and profit.

24. <u>Adnan Palace</u>. Before U.S. occupation of Baghdad, Adnan Palace was a high-domed edifice that Saddam Hussein used as a retreat. Now, the Iraqi Interior Ministry uses it as a headquarters. The Interior Ministry is in charge of Iraqi police forces.

25. Because of the police functions at Adnan Palace, CivPol became responsible for operations and maintenance at the palace. CivPol delegated this responsibility to DynCorp, which issued task orders for operations and maintenance to Sandi. Here again, Sandi was supposed to charge its actual cost, plus a small mark-up.

26. Without competition, Sandi issued a subcontract to Hazums Construction for the operation and maintenance of Adnan Palace. This included power generation, and temporary generators. The price of the subcontract was far greater than the fair market price of such goods and services.

27. Sandi owns fifty percent of Hazums Construction.

28.  Vehicles.  DynCorp issued task orders to Sandi for Sandi to purchase hundreds of cars and trucks, for the use of CivPol staff.  Once again, Sandi was supposed to charge its actual cost for these vehicles, plus a small mark-up.

29.  Sandi charged DynCorp and, indirectly, the Government, as much as four times the actual cost of these vehicles.

30.  Phantom Staff.  When Sandi priced CivPol task orders for DynCorp, Sandi routinely included charges for security guards and translators, even for work that was being performed exclusively by Sandi-employed Iraqis.

31.  In many cases, Sandi never hired these security guards and translators.  It billed for them anyway.  In other cases, Sandi awarded these positions as "no-show jobs" to favored locals.  It billed for these positions, as well.

32.  Sandi also gave no-show jobs to Rubar Sandi's ex-wife, and two daughters.

33.  The overcharging for this phantom staff, by itself, ran to millions of dollars.

34.  Hazard and Hardship Pay.  When Sandi priced CivPol task orders for DynCorp, Sandi routinely included charges for hazard pay and hardship pay for Sandi employees.  In general, Sandi did not pay such hazard pay or hardship pay to its employees.  This was well-known and well-discussed within Sandi's Human Relations Department.  Sandi nevertheless billed hazard and hardship pay for all U.S. hires to DynCorp, and indirectly, the Government.

35.  Corruption.  Sandi employed local subcontractors to build several of its eleven CivPol camps.  There was a U.S. Department of State official named Wayne who inspected the camps, approved them, and authorized payment.  Wayne had an ownership interest in these subcontractors.  Sandi knew this connection, and exploited it to obtain approval and payment.

36. Sandi deliberately avoids retaining accurate books and records, because they would be incriminating. In some cases, evidently at the Government's initiative, DynCorp requested documentation for some Sandi expenses. Sandi then fabricated this documentation, falsely, and after the fact. The documentation that Sandi submitted did not correspond to Sandi's actual costs.

37. On one occasion, Sandi financial records in Iraq were inadvertently shipped to Sandi's Washington, D.C. headquarters. In Washington, D.C., they would be readily subject to a Government subpoena or "raid." Therefore, Sandi shipped them back to Iraq immediately. This cost over $20,000.

38. Defendant Rubar Sandi was intimately involved in each of these fraudulent schemes. He not only knew of them, but he vigorously encouraged them. He prevailed on some reluctant Sandi employees, such as the Chief Financial Officer, to join in this. Under him, war profiteering was, in effect, company policy.

39. Defendant DynCorp also was aware of these fraudulent schemes. They were the subject of open conversation between Sandi and DynCorp managers.

40. There were several reasons for DynCorp's collaboration. The first was that Sandi did, in fact, provide the vehicles, camps and other CivPol support for which DynCorp issued task orders. Despite having received the contract award from the Government, DynCorp did not have this capability itself. DynCorp feared that reporting or even restraining Sandi might jeopardize DynCorp's own CivPol performance, and risk the loss of a billion-dollar prime contract.

41. The second reason was that DynCorp suffered no financial penalty from Sandi's cheating. On the contrary, higher subcontractor bills ultimately resulted in higher DynCorp profit, through higher prime contract "fees," the negotiation of change orders, *etc.*

42. The third reason was that, on information and belief, DynCorp itself engaged in similar shenanigans.

43. Despite actual knowledge of the CivPol overcharges, DynCorp did not establish any purchasing procedures or guidelines to avoid the fraud.

44. Under the terms of its subcontracts with Sandi, DynCorp had the right to charge Sandi hundreds of thousands of dollars in liquidated damages for cost overruns, *etc.* DynCorp chose not to do so.

### III. Sandi's Retaliation

45. *Qui Tam* Plaintiff Halldorson was a very successful member of Sandi's staff. During his six months of service, as noted above, he received both a promotion and a 50% raise.

46. Halldorson was successful in his new assignment in Business Development. He sought to obtain new work for Sandi in Romania and in Florida.

47. Halldorson investigated Sandi's overcharging under its CivPol task orders in Iraq. He complained to supervisors about this overcharging.

48. Sandi told Halldorson that Sandi was transferring Halldorson to a different country. Sandi instructed Halldorson to return to the United States and await the transfer. After Halldorson returned to the United States, Sandi dismissed him.

49. On information and belief, DynCorp and Sandi are seeking to extend CivPol to large task orders in Afghanistan, where Sandi will commit the same fraud.

50. On information and belief, Sandi is removing millions of dollars from corporate accounts, to make it more difficult for the Government to recover the money that Sandi has stolen.

### First Claim-FALSE CLAIMS

51.   All of the preceding allegations are incorporated herein.

52.   On information and belief, DynCorp submitted invoices under the contract on or about every two weeks, from shortly after April 17, 2003 to the present, and continuing during the pendency of this lawsuit. On information and belief, each invoice certified that the goods and services delivered conformed to the terms of the contract, and that the charges were correct.

53.   Since mid-2003, and continuing during the period of this lawsuit, these DynCorp claims have been based on, and have incorporated, inflated charges under Sandi subcontracts and task orders. Therefore, each of the invoices submitted to the Government was false and fraudulent. On information and belief, these claims were submitted to the U.S. Department of State at 2201 C Street, N.W., Washington, DC 20520, or at P.O. Box 9115, Rosslyn Station, Arlington, Virginia 22219, *inter alia*. DynCorp knowingly presented these false claims for payment or approval. Sandi and Rubar Sandi caused them to be presented.

54.   The Defendants thus knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States false or fraudulent claims for payment or approval.

### Second Claim- FALSE STATEMENTS

55.   All of the preceding allegations are incorporated herein.

56.   The Defendants knowingly made, used or caused to made or used numerous false records or statements to get the false or fraudulent claims paid or approved. For instance, DynCorp's proposals to the Government, Sandi's proposals to DynCorp, DynCorp's performance reports to the Government, Sandi's invoices to DynCorp, and Sandi's fake subcontractor documentation all were such statements.

57. The Defendants thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

WHEREFORE, for each of the first two claims, the *Qui Tam* Plaintiffs request the following relief from the Defendants:

A. Three times the amount of damages that the Government sustains because of the acts of the Defendant;

B. A civil penalty of $11,000 for each violation;

C. An award to the *Qui Tam* Plaintiffs for collecting the civil penalties and damages;

D. Award of an amount for reasonable expenses necessarily incurred;

E. Award of the *Qui Tam* Plaintiffs' reasonable attorneys' fees and costs;

F. Interest; and

G. Such further relief as the Court deems just.

### Third Claim- FALSE CLAIMS RETALIATION

58. All of the preceding allegations are incorporated herein.

59. For the reasons alleged above, *Qui Tam* Plaintiff Halldorson was an employee who was discharged, suspended, threatened, harassed, and in other manners discriminated against in the terms and conditions of employment by his employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of a False Claims Act action under this section. This includes his investigation for this action.

WHEREFORE, for this claim, *Qui Tam* Plaintiff Halldorson requests the following relief for the Defendant:

A. All relief necessary to make the *Qui Tam* Plaintiff whole;

B. An order providing for reinstatement with the same seniority status that the *Qui Tam* Plaintiff would have had but for the discrimination or, in the alternative, front pay;

C. Two times the amount of back pay and front pay;

D. Inertest on the back pay and front pay;

E. Compensation for special damages sustained as a result of the discrimination, including but not limited to litigation costs and reasonable attorneys fees;

F. Pre-judgment and post-judgment interest;

G. Punitive damages; and

H. Such further relief as the court deems just.

## Fourth Claim- STATE LAW RETAILIATION

60. All of the preceding allegations are incorporated herein.

61. *Qui Tam* Plaintiff Halldorson threatened to disclose, to a supervisor or to a public body, an activity, policy or practice of the Defendant that was in violation of law, rule or regulation. This violation created and presented a substantial and specific danger to public health and safety.

62. Halldorson provided information to a public body conducting an inquiry into this violation.

63. Halldorson objected to, and refused to participate in, this violation.

WHEREFORE, for this claim, *Qui Tam* Plaintiff Halldorson requests the following relief from the Defendant:

A. An injunction to restrain continued violation;

B. An order providing for reinstatement to the same position held before the retaliatory personnel action; or an equivalent position; or, in the alternative, front pay;

C. The reinstatement of full fringe benefits and seniority rights;

D. Compensation for lost wages, benefits and other remuneration, including but not limited to back pay and front pay;

E. Interest on the back pay and front pay;

F. Payment of reasonable costs, disbursements and attorneys' fees;

G. Pre-judgment and post-judgment interest;

H. Punitive damages; and

I. Such further relief as the Court deems just.

## JURY REQUEST

The *Qui Tam* Plaintiffs request a jury for all issues that may be tried by a jury.

Respectfully submitted,

_____
Victor A. Kubli (MD012917)
KUBLI & ASSOCIATES, P.C.
13948 Bromfield Road
Germantown, MD 20874
(301) 801-2330

Attorney for *Qui Tam* Plaintiffs
 Andrew Halldorson and Brian Evancho

## Certificate of Service

I certify that on this 11th day of February 2011 a copy of the foregoing was served by U.S. Mail upon the below counsel for the United States:

Laurie Weinstein
Assistant United States Attorney
555 Fourth Street, NW, E 4820
Washington, D.C. 20530

Michal L. Tingle
Attorney, U.S. Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044

_____
Victor A. Kubli